This is, again, an appeal from a judgment of the District Court in the District of Delaware, our busy Delaware District Court, from where so many of our patent cases come. Yes, ma'am. But thankfully, they have two more judges right now. Just this week. Yes. Okay. Mr. Holdreth, you want three minutes for a rebuttal? Yes, ma'am. Okay. You may begin. Thank you. May it please the Court, I'm Jake Holdreth for the appellant, Unifrax. Unifrax asks this Court to reverse the District Court and render judgment for Unifrax on grounds of non-infringement and or invalidity, as detailed in our briefs. I plan to focus my remarks this morning on the claim construction issue. The District Court erred by construing the 100% inorganic platelet limitation using a special definition, that there is no carrier. This allowed any percentage- Under your construction, wouldn't it seem that the components of the refractory layer would have to add up to 110%? So the claim does permit 10% residual moisture. That's right. And that was a confusing issue at claim construction. But it's important to understand the source material for these vermiculite layers, as described in the patent, is vermiculite flakes dispersed in water. They're made by W.R. Grace. And that's the conventional way that you make this vermiculite platelet layer. You take the vermiculite in water, and you spread out a thin layer of it, and then you let the water evaporate. Is there a difference between residual moisture and residual dispersant? There could be, Your Honor. The claim only permits residual moisture, which can evaporate. That's consistent with being simply 100% platelets in water. There are other dispersants. The claim does not include permission to have a residual dispersant. So as I- It could have added that. moisture, so you're talking about dry platelets? You're correct, Your Honor. Although it could also be after drying of the platelet layer. So you lay down this wet dispersion of vermiculite. You dry the water off. And then you can have 100% platelets. As a practical matter, you can have 10% residual moisture, because it's hard to dry it off. Although it is possible to dry that water off and measure the platelets alone and come up with a 100%- So you're saying even after drying, you have 100% platelets? After drying, the claim requires, if it's fully dried and the residual moisture is dried off, then you would have 100%- Okay, if there's no residual moisture left, but the claim itself specifically contemplates residual moisture. Correct. That's what I'm trying to understand. That's the only thing it permits. You can have 100% vermiculite platelets plus 10% residual moisture. And that is all that is permitted. The critical issue in the case is, can you also have 5% of an organic additive? And the claim language, the intrinsic evidence, is very clear that you may not have 95% platelets and up to 5% or more of a silicon additive. And so I'm disputing in this case, that's what the accused product was. When the district court adopted its construction and started talking about these other additives, did you ever ask the court to define what those other terms mean? Repeatedly, Your Honor, and especially to make clear that 5% silicon additive is not permitted. We did that in the claim construction briefing where we said a formulated vermiculite is not permitted. We did that at summary judgment where we said silicon additives are not permitted, and we did it at J-Mall. I guess I'd like to draw the court's attention to- Was there any extrinsic testimony here? Any expert testify to what the 100% by weight limitation means? Well, we were careful at trial not to argue the claim construction issue to the jury. At claim construction, we did not offer- Correct, but at claim construction- No, ma'am. We did not. The parties did refer to the intrinsic evidence in the specification, which is that the vermiculite or the platelets can be defined by the specifications referenced in the WR-Grace material, and the parties did refer to the properties as explained by WR-Grace, and I can draw your attention to Appendix 7615, if I may. Sorry. Yes, ma'am. 7615? 7615. It's a WR-Grace description of microlite vermiculite dispersions. Okay. Now, this is a document which the specification, at least, indirectly refers to when specification says that suitable materials are vermiculite from WR-Grace, including microlite 963 and 963XE. That's in column three at line 46. What you see from this description is two columns under the table. On the left side, there's a description of non-formulated products, and the description says the non-formulated products, which happen to be 903HTS and 923, are 100% inorganic dispersions of vermiculite in water. So that tells you what 100% means. It's the vermiculite flakes in water. That's all there is. On the right side, it describes formulated products, like what is used in the accused product, and those are vermiculite that consists of microlite HTS, which is vermiculite flakes, with proprietary additives to promote adhesion. And the last sentence says these products may contain up to 20% by weight of organics. Well, this was one of the disputes. I mean, I have to confess that this record was difficult to follow in terms of what it was the jury was being asked to determine, but doesn't it say proprietary additives to promote adhesion, improve wetting, and or increase end product water resistance? Does any of that indicate that those products could also be dispersants? Well, we say no, it does not. Particularly not in a dry state, but what this description informs is that you have two choices when you have vermiculite. You have unformulated, which is 100% vermiculite in water, as described by Grace, and you have formulated, which is less than 100% in water. It has up to 20% additives. That is exactly what was disclaimed. Why is it less, because it's got these other properties to it, the proprietary additives, and to improve wetting? Is that what causes it to be less than 100? Right. The additives cause it to be less than 100. There's up to 20% additives, so it could be as low as 80% vermiculite flakes. The particular vermiculite, formulated vermiculite, used in the fused product, it's undisputed, it had 5% of the additive, 5% PDMS and 95% vermiculite flakes. So, the formulated versions with less than 100% vermiculite flakes is exactly what was disclaimed by the narrowing amendment. The specifications, the court knows, described using vermiculite in a series of purity, 85%, 90%, 95%, or 100%. That's in column 3 at Lyons. When you say by the, so you're now referring to the prosecution history? Yes, ma'am. But, you know, your friend on the other side is going to argue that that prosecution history is not actually a clear disclaimer, because what it was attempting to distinguish in the prior art was different from what you're arguing it was distinguishing. Well, I'll get to the argument disclaimer in a second. I'm talking about the amendment estoppel here, which is, the amendment is found in appendix 374. I don't think the court needs to look at it. It's undisputed. It amended the claim from a layer comprising platelets to a layer comprising platelets in an amount of 100% by weight. So, that was added during prosecution. They narrowed their claim to the unformulated version, 100% platelets in water. They narrowed out the formulated versions, which were described in the specification, 85%, 90%, 95%. 95%, that's us. That was specifically narrowed out of this claim by amendment. Is your argument that dispersants and carriers are mutually exclusive? Well, my primary argument is that that is a construction issue that should never have reached. Rather, any amount of an additive we view as less than 100% platelets. But there's got to, I mean, but the rest of that language does add some ambiguity, right? Residual moisture. The one thing you can have is some water left over from the process. That's just a practical reality that when you lay down flakes in water, you're going to have some water left over. But that is the only thing the claim permits, is residual moisture, water. That's not inconsistent with 100% flakes in water. It doesn't say you can have residual silicone. It doesn't say you can have residual dispersant. There's description in the specification when they had their original disclosure, which was broader than 100%, where they said, well, you could also have residual dispersant. But their narrowing amendment went to the 100% in water. So if they had wanted to have a claim that allowed residual dispersant, the claim could have said residual dispersant. It doesn't. It only allows residual moisture. So our view is the amendment, first of all, the plain meaning is it's straightforward. It's 100% flakes. A jury can understand what 100% means. It's undisputed in this case. There were less than 100% flakes, only 95%. If you go to the intrinsic evidence, then the amendment makes it even clearer that it was disclaimed down to 100% flakes. You can't have 80%. You can't have 95%. But it is true that the specification does talk about other formulations with less than 100%. It absolutely does. And those were disclaimed away and narrowed by virtue of the amendment. I mean, that's undisputed. This claim does not allow 80% or 95% vermiculite flakes. It explicitly recites 100%. So those embodiments were narrowed away by amendment. There is even further intrinsic evidence in the child application. During the prosecution of a child of this application that had an identical limitation at issue, 100% inorganic material, the patentee was confronted with the Mormont prior art, which was 95% flakes and 5% silicone. And the patentee distinguished that Mormont prior art by saying his invention was 100% flakes and that that was useful because getting rid of the silicone would reduce the risk of potential toxic emissions during burning. Do you think the court erred in referring to the parent application? I do. Your Honor, the parent application provides a special definition of 100%, and it's a broadening definition. When you say 100% simply means no carrier, that means you can have any percentage of flakes and any percentage of any other material as long as it's not a carrier. So that is a special definition and a broadening one. It is found only in that parent specification, and it was eliminated in continuation practice. The public can conclude from striking that special definition from the specification of the patent in suit only that it does not apply. And it makes sense that it wouldn't apply. I could go into why the parent application was prosecuting a different invention, one that had vermiculite sandwiched in an envelope that was sort of floating freely in this envelope. It didn't have a carrier. But so your position is not so much that the court erred in even considering it, but it erred in giving it undue weight. I think that's accurate. It's not my view that a court could never look at language in a parent that's been removed from an asserted patent. But certainly under the facts of this case, where the language is used for lexicography because it was a broadening and special definition, not ordinary meaning, where it doesn't make sense when applied to this invention, and where having been removed from the specification, the public can't possibly be expected to say, yes, the language that was stricken is the special definition that will apply here. That was error, certainly. So why is it that the court erred in relying on the parent application? Is it because the claim terms are different or the claim term we're looking at here is not in the parent application? That is certainly one important consideration, and there are others. So one is that the absence of the claim term from the parent application, we're not foreclosed from or the court's not foreclosed from considering the parent application. I agree with that, Your Honor. We're not advocating a rule where the court could never look at language in a parent that was removed and stricken from an asserted patent. But in the context of this case, where it's being used as lexicography to provide a special broadening definition, and it was stricken from the application of the asserted patent, that seems highly problematic. And then when you add to that that it doesn't even fit this claim. So the claim in this case requires that the vermiculite be bonded to a polymer film adhesively. That is a carrier. That's what a carrier is. It makes no sense to say in this invention there is no carrier. In addition, we've got the claim being narrowed to 100% platelets. So that definition, there is no carrier, doesn't take into account the narrowing amendment during prosecution. It was also in that specification, while they were prosecuting, a very different invention from the one claimed in this case. Under those circumstances, it was not proper to use that special definition as the claim construction in this case. So the jury was asked the wrong question. Okay. You're out of time. We'll give you two minutes for rebuttal. I would like to reserve my time. Thank you. You had about a second left, so I'll give you two minutes. Thank you, Your Honor. Nothing to reserve. Mr. Landgraf, can we start with the last point, that parent application? Sure. I've got a real problem with using the parent application for lexicography. I mean, the 926 has an entirely different specification, right? Not entirely. It's similar. It did not adopt or incorporate by reference the 027 parent. But the specification for the 926 is an independent specification rather than having the same specification, right? That's correct. And it doesn't refer to carrier material? The 926 specification does refer to fiber material and the desire to avoid that. So it's consistent with the 027 parent application. Well, the 027 doesn't even contain the 100% by weight limitation. It doesn't contain the limitation in a claim, but it does describe the 100% by weight limitation in the specification of the 027. So the language is taken verbatim from the 027 patent. It's not in a claim in the 027 patent, but it's in the specification of the 027 patent. But you all both, as I understood it, explained to the district court that he couldn't really use the 027 for purposes of lexicography for this separately claimed patent. We are not arguing lexicography. And yet he took the exact language out of the 027 and made it his construction, right? That's right. And the verbatim language from the 027 is supported not only, obviously, in the 027 specification, but it's supported by the prosecution history of the 926 patent. Because in the prosecution history, the inventors overcame the Tompkins patent, which had carrier material. And the patentee said, we don't want carrier material. It makes it too heavy and too brittle. And so they disclaimed layers with carrier material. The 926 specification said that including fibers, which is a carrier material, that's a cloth, makes the material brittle and too heavy. So they moved away from it in the specification. And then the claim language itself also supports the idea that 100% by weight is relative to something. Because as you pointed out, Judge O'Malley, the limitation includes 100% by weight as well as 10% moisture. And the way Judge Andrews reconciled the 110% was to say that 100% means it's relative to something. It's relative to carriers. But the claim itself says 100% by weight platelets. Correct. And that the only thing that it says is permitted is residual moisture. That's what the claim language says. And so one of ordinary skill would look to the intrinsic record here to determine what that 100% by weight limitation means. When you look at the 027 patent, you look at the prosecution history. The passage from the 027 that the court was relying upon was one that was distinguishing a layer containing primarily platelets with one containing a lightweight open weave fabric scrim embedded into or laid onto the inorganic platelet layer, which is a totally different concept than what's at issue here. It's a different—well, it's distinguishing it from a different layer, but the layers themselves are the same. The inorganic refractory layer described in the 027 patent is the same as it is in the 926 claim. They both want to avoid—they desire to avoid carrier material. But even if you don't look at the 027 patent— If that's what you meant, why didn't you write it? I find this to be a horribly written claim. I mean, just facially, when you get 100% and 10%, you get a layer that has 110%. I don't understand why there's not an indefiniteness challenge in this. There wasn't an indefiniteness challenge, and the reason is because you can reconcile the 100% by weight with the 10% moisture by saying 100% by weight relative to what? And the district court said— Why didn't that get into the claim language? I don't know why it didn't get into the claim language, mainly because the prosecution history made clear that what was being overcome was— It has 100% platelets, and then it has a residual 10%. I assume you bring moisture as water. No, moisture can be dispersant. That wasn't argued below, so there wasn't an argument about what moisture is. Do you equate residual moisture with residual dispersant? Residual moisture can include residual dispersant, yes. They don't have to be the same. It can be water, but it also could be dispersant. And dispersant could also be dry. Can it be an adhesive? No. No, and the jury found that what was included— Part of my problem was that there was no definition of carrier given to the jury, no definition of dispersant given to the jury, no definition of— There was a definition of carrier. It was resin, cloth, or paper, and there wasn't a disputed trial. The factual disputed trial was, is the additive, is it dispersant, or is it a resin? And the jury found there was substantial evidence to support the notion that the additive in the accused product is a dispersant, which is permitted under the claim, and the 926 specification itself allows for residual dispersant. So that's intrinsic in the 926 itself. So the claim construction is supported by— Well, it doesn't say allowing for residual dispersant. It says allowing for residual moisture. Well, the specification talks about residual dispersant is allowed, and the court included that in its construction. But that specification was written before the claim was amended to, say, 100%, right? No, that part of the specification includes 100% by weight. The part of the specification, which is at Appendix 52, Column 3, Lines 21 to 26, talks about in some embodiments, platelets comprise 100% of the layer. The refractory layer may comprise some residual dispersant arising from incomplete drying. So how much dispersant is permitted before it's no longer residual? If it's wet dispersant, 10%. It doesn't specify if it's dry. Wasn't there similar language in the 027? There is similar language in the 027, Judge Raina, and that's consistent. What you get from the intrinsic record here is a consistent picture of inventors distancing themselves from carriers. They didn't want carrier because the Tompkins patent had carrier, and the continuation patent, the child patent that Counsel, my friend, referred to, the inventor said that the refractory layer is binder-free. That, again, is an indication that they don't want carrier. So the entire intrinsic record here is consistent with the fact that they're trying to avoid carrier. I want to address my friend's first argument where he said that somehow when he referred to the appendix at page 7615 indicating that formulated vermiculite was disclaimed, that's just not true. The patent itself, appendix 52, column 3, line 44, says suitable vermiculite materials available from WR Grace under the trade designations Microlite 963, Microlite HTSXE, which is what Unifrax uses and which is what is identified in the formulated products. So Counsel's mistaken to suggest that these were disclaimed. They're specifically in the specification. The patent talks about an inorganic layer, right? Correct. But your view is that whatever is residual could be organic material? If it's not a carrier. So it has to be 100% platelets relative to carrier. How is that inconsistent with claiming an inorganic layer? It's consistent because you can't have inorganic platelet material in there. It is recognized that there can be dispersant or moisture as long as it's not a carrier. But it didn't say a layer with inorganic platelet material. It said an inorganic layer. It said an inorganic layer with 100% platelets by weight, but it also allowed for 10% moisture. And so the entire claim history here, all of the intrinsic record, is geared toward avoiding carriers. The district court's method here was similar to the district court's method in the V-formation case in which the court wasn't getting a special meaning. It just went back and looked at what the person of ordinary skill would have viewed and said that the term means this, and there the issue was releasably attached. And the court said it means easily attached, but it also means you can't use rivets to attach the bindings on because rivets are permanent. And the district court in V-formation got that from looking at the intrinsic record, just like Judge Andrews did here. He went to the intrinsic record and saw... But you're saying that everything about this patent is to get away from carrier material, right? I'm saying everything in the intrinsic record relating to this term. But now we're building in concepts of carrier material into the patent. But the carrier material is already mentioned in the patent. Column 4, which is appendix page 52, column 4, lines 18 through 20, or 19 and 20, talks about a refractory layer comprising ceramic fiber is much more porous, brittle, and friable. It's distinguishing its invention from a layer containing carrier material like the ceramic fiber that was in the Tompkins material. So again, holistically, the 027 patent, the prosecution history here, the specification here, the claim language here, and the continuation all support this notion that there can't be carrier material. Why didn't you offer extrinsic evidence? Why didn't you offer testimony with respect to what these concepts mean? It wasn't in dispute. I mean, in terms of what carrier material is. You mean it wasn't in dispute. I thought you were asking why we didn't explain what carrier material is. We didn't need extrinsic evidence to explain what the construction of 100% by weight meant. The intrinsic record is consistent there. It presents a consistent picture of disclaiming carrier material and saying instead we should have all organic platelet material relative to carrier. We don't want paper. We don't want resin. We don't want adhesive in that layer. We want it to be smooth, essentially. But it also says in the claim we don't want anything other than residual moisture. You think we should reduce it? It says 100% platelet material and 10% residual moisture. And so the way to reconcile that 110% is to say that 100% is relative to something, and the intrinsic record makes clear it's relative to carrier material. The final thing that I just want to focus on, because my friend mentioned it, the continuation application supports the court's claim construction. He referred to it as the child patent, and that's at appendix page 7637, where the same inventors, and this is before the Markman decision came down, said that the refractory layer is, quote, binder-free, end quote, in distinguishing itself from the prior Art Mormont patent. Again, binder here at trial was undisputed, was used interchangeably with resin, with adhesive. Binder means a carrier. And so, again, the inventors are consistent in their disclaiming carrier material and instead focusing on the inorganic refractory material relative to carrier material. So you've got a parent, you've got a child, you've got the prosecution history, and you've got the specification all consistent with Judge Andrew's construction. And if the panel has no further questions, I'd ask the court to affirm. Thank you. Thank you briefly, Your Honors. Of course the specification does describe formulated vermiculite with additives in it. That is what was disclaimed. So the presence of the words Microlite XE in the specification, I think, don't do anything to limit the disclaimer. They had to go from less than 100% to 100%. That is exactly what they disclaimed. I think this is really, in many ways, a public notice case. And I know the patentee would like to now say, well, we get to tiptoe up to the line of Tompkins, and anything that is not Tompkins we get to keep within our claim. That's not fair, and that's not how public notice works. They limited their claim to 100%. They narrowed their claim to 100%. They don't get to now take it back and say, well, we really wish we had said a layer that does not include the fiber of Tompkins. Judge Andrews actually did recognize that we put him on notice at claim construction that construing the claim as no carrier would simply confuse and render the claim ambiguous, and he recognized that. It's in Appendix 26. He said it may cause some further debates over terms. Right. And we repeatedly asked Judge Andrews, please clarify your construction and make it clear that silicon additives are not permitted. That is the decisive issue in this case. That is what was narrowed out of the case. That is the plain meaning of 100%. That's how Grace describes it. So you're saying this is an O2 micro problem? We did ask the judge to clarify even after closing arguments, but we asked him before in summary judgment at the JMAL. So it is a huge problem that the judge adopted a construction that was ambiguous and confusing, and the plaintiff did dance around with carrier and what does carrier mean. In our brief, there's an extensive discussion of how their expert tried to use that to distinguish Wormont in a way that we found unsupported and baseless. You can't reconcile his construction for purposes of infringement with the construction that was used to try to distinguish Wormont, and it was a highly problematic construction. This case has a plain meaning. It's a straightforward case. 100% means 100%. Undisputed here that the layer is made of less than 100% platelets, so we request the court to reverse and render. All right. Thank you. Thank you.